Ra'Ed Mohamad Ibrahim MATAR,
et al., Plaintiffs,

v.

Avraham DICHTER, former Director
of Israel's General Security
Service, Defendant.

No. 05 Civ.10270(WHP).

United States District Court,
S.D. New York.

May 2, 2007.

Jennifer M. Green, New York City, for Plaintiffs.

Robert N. Weiner, Arnold & Porter, LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiffs bring this putative class action pursuant to the Alien Tort Statute ("ATS") and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 and Note, against Avraham Dicther ("Defendant" or "Dichter"), former Director of the Israeli General Security Service ("GSS"). The Complaint alleges that Defendant committed the following acts: (1) war crimes; (2) crimes against humanity; (3) cruel, inhuman or degrading treatment or punishment; (4) extrajudicial killings; (5) wrongful death; (6) negligence; (7) public nuisance; (8) battery; (9) intentional infliction of emotional distress; and (10) negligent infliction of emotional distress. Defendant moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1). For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

The Complaint alleges that since the fall of 2000, Israel has systematically committed "targeted killings" of suspected terrorists. (Complaint, dated Dec. 5, 2005 ("Compl.") ¶ 17.) The targeted killings are allegedly performed with knowledge that civilians may be killed or injured. (Compl.¶ 17.) Since September 29, 2000, 327 suspected terrorists and 174 bystanders have died in targeted killing attacks. (Compl.¶ 18.)

On July 22, 2002, the Israeli Defense Forces ("IDF") bombed an apartment building in al-Daraj, a residential neighborhood in Gaza City in the Occupied Palestinian Territory. (Compl.¶¶ 1, 22.) The attack was intended to and did kill Saleh Mustafa Shehadeh, an alleged Hamas leader who was on the upper floor of the building. (Compl.¶ 23.) The bomb seriously damaged the building and nearby structures, killing fourteen civilians and wounding 150. (Compl.¶¶ 1, 24–25, 32.) Plaintiffs are individuals who were injured, and/or represent those who were killed or injured, in the attack. (Compl.¶ 2.) The United States Department of State (the "State Department") and the White House have criticized the al-Daraj bombing. (Compl.¶ 3.)

Defendant is a former director of GSS, one of several Israeli security organizations that collectively form the Israeli Security Forces. (Compl.¶ 36.) The main preparations for Israel's targeted killings are allegedly conducted by GSS, which coordinates directly with IDF during each operation. (Compl.¶¶ 37–38.) Final approval for an attack is issued by GSS. (Compl.¶ 38.)

Dichter allegedly authorized, planned and directed the al-Daraj bombing.

(Compl.¶¶ 2, 40, 43.) More generally, the Complaint alleges that Ditcher "developed, implemented, and escalated" Israel's targeted killing policy, and that the al-Daraj attack was "part of a pattern and practice of systematic human rights violations designed, ordered, implemented and directed with the participation of Defendant and carried out by military personnel acting at his direction." (Compl.¶¶ 19, 63.)

Plaintiffs filed this action on December 7, 2005. On February 6, 2006, Daniel Ayalon, then-Israeli Ambassador to the United States, conveyed to the State Department Israel's "concerns regarding the fundamental inappropriateness and political nature" of the action. (Declaration of Jean E. Kalicki, dated Feb. 22, 2006, Ex. A: Letter from Daniel Ayalon to Nicholas Burns, dated Feb. 6, 2006 ("Ayalon Letter") at 1.) Ayalon stated:

> The[ ] lawsuit[ ] would embroil the U.S. courts in evaluating Israeli policies and operations in the context of a continuing armed conflict against terrorist operatives. [It] touch[es] directly upon issues related to the Middle East peace process and ongoing and extensive diplomatic efforts ... While ostensibly brought against Mr. Dichter ... the[ ] case[ ] challenge[s] sovereign actions of the State of Israel, approved by the government of Israel in defense of its citizens against terrorist attacks ... [A]nything Mr. Dichter ... did in connection with the events at issue in the suit[ ] was in the course of [his] official duties, and in furtherance of official policies of the State of Israel.

(Ayalon Letter at 2.)

On February 22, 2006, Defendant moved to dismiss the Complaint on the grounds that: (1) Defendant is immunized from suit under the Foreign Sovereign Immunities Act ("FSIA"); (2) this action presents a nonjusticiable political question; and (3) the action implicates the act of state doctrine. On July 20, 2006, this Court issued an Order inviting the State Department to "state its views, if any" on Defendant's motion. On November 17, 2006, the State Department submitted a memorandum urging this Court to dismiss the action on grounds of sovereign immunity. (Statement of Interest of the United States of America, dated Nov. 17, 2006 (the "Statement of Interest") at 4–35.) The Statement of Interest warns that "any refusal by U.S. courts to grant immunity to foreign officials for their official acts could seriously harm U.S. interests," and asserts that: "[F]oreign officials such as Dichter do enjoy immunity from suit for their official acts. This immunity is not codified in the [FSIA, as Dichter has argued,] but instead is rooted in longstanding common law that the FSIA did not displace ..." (Statement of Interest at 2.) The Government also contends that there is no private cause of action for the disproportionate use of military force in armed conflict. (Statement of Interest at 35–51.) According to the Government, policing armed conflicts around the world "would exceed judicial competence and intrude on the Executive's control over foreign affairs." (Statement of Interest at 3.) Finally, the Statement of Interest contends that the Government's concerns about judicial competence and separation of powers "sound as well under the political question doctrine." (Statement of Interest at 51 n. 36.) Thus, even "if plaintiffs had a valid cause of action by which to bring their claims, there would be a serious issue whether this particular case should be dismissed on political question grounds ..." (Statement of Interest at 51 n. 36.)

## DISCUSSION

### I. *Motion to Dismiss Standard*

A motion to dismiss for subject matter jurisdiction under Rule 12(b)(1) is

reviewed under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). On a motion to dismiss, a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor.[1] *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). Although on a motion to dismiss a court is generally limited to examining the sufficiency of the pleadings, where, as here, a challenge is directed at the court's subject matter jurisdiction, the court may examine materials outside the complaint to resolve jurisdictional issues. *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998); *In re South African Apartheid Litig.*, 346 F.Supp.2d 538, 546 (S.D.N.Y.2004).

## II. *Sovereign Immunity*

### A. *FSIA*

■ The FSIA is the exclusive source of subject matter jurisdiction in suits brought against a foreign state. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138 (2d Cir.2001); *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 746 (2d Cir.2000). It provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. "Foreign state" is defined by the FSIA to include

"an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 150 n. 10 (2d Cir.2001). To qualify as an agency or instrumentality, an entity must be: (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state"; and (3) "neither a citizen of a State of the United States ... nor created under the laws of any third country." 28 U.S.C. § 1603(b).

■ A foreign state, or an agency or instrumentality thereof, will not be immune from suit in the United States courts if it falls within any of the statutory exceptions enumerated in the FSIA. *See* 28 U.S.C. § 1604. "[I]f none of the exceptions to sovereign immunity applies, district courts lack jurisdiction in suits against a foreign state, or an agency or instrumentality thereof." *Foremost–McKesson, Inc. v. Iran*, 905 F.2d 438, 442 (D.C.Cir.1990); *accord Abrams v. Societe Nationale des Chemins de Fer Francais*, 332 F.3d 173, 179 (2d Cir.2003). Thus, the FSIA "must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

■ This Court must first consider whether foreign officials such as Dichter are eligible for immunity under the FSIA as "agencies or instrumentalities" of a foreign state. Plaintiffs contend that they are not. However, "[t]he Court is mindful that foreign sovereigns are legal fictions to the extent that they can only act through

---

1. Although Defendant purports to move solely under Rule 12(b)(1), a motion to dismiss on political question grounds is appropriately analyzed under Rule 12(b)(6). *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 438 F.Supp.2d 291, 294–95 (S.D.N.Y.2006). Nevertheless, for the reasons discussed below, the Court would dismiss this action on political question grounds regardless of which rule applies.

their individual officers." *Doe v. Israel,* 400 F.Supp.2d 86, 104 (D.D.C.2005); *see also Velasco v. Indonesia,* 370 F.3d 392, 399 (4th Cir.2004) ("Claims against the individual in his official capacity are the practical equivalent of claims against the foreign state."); *In re Terrorist Attacks on Sept. 11, 2001,* 392 F.Supp.2d 539, 551 (S.D.N.Y.2005) (noting that "it is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly") (quoting *Bryks v. Canadian Broad. Corp.,* 906 F.Supp. 204, 210 (S.D.N.Y.1995)). To allow "unrestricted suits against individual foreign officials acting in their official capacities ... would amount to a blanket abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what the [FSIA] barred them from doing directly." *Chuidian v. Phil. Nat'l Bank,* 912 F.2d 1095, 1102 (9th Cir.1990).

▌ Although the Second Circuit "has not clearly addressed" the issue of whether the FSIA applies to individuals, *Kensington Int'l Ltd. v. Societe Nationale Des Petroles Du Congo,* No. 05 Civ. 5101(LAP), 2006 WL 846351, at *13 (S.D.N.Y. Mar. 31, 2006), numerous courts have found that "immunity under the FSIA extends also to agents of a foreign state acting in their official capacities ..." *In re Terrorist Attacks,* 392 F.Supp.2d at 551; *see also Velasco,* 370 F.3d at 398–99; *Byrd v. Corporacion Forestal,* 182 F.3d 380, 388 (5th Cir.1999); *Keller v. Cent. Bank of Nig.,* 277 F.3d 811, 815 (6th Cir.2002); *Jungquist v. Al Nahyan,* 115 F.3d 1020,

1027 (D.C.Cir.1997); *El–Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 671 (D.C.Cir. 1996); *Chuidian,* 912 F.2d at 1103; *Leutwyler v. Al–Abdullah,* 184 F.Supp.2d 277, 286–87 (S.D.N.Y.2001); *Tannenbaum v. Rabin,* No. 95 Civ. 4357(ILG), 1996 WL 75283, at *2 (E.D.N.Y. Feb. 13, 1996); *Bryks,* 906 F.Supp. at 210; *Kline v. Kaneko,* 685 F.Supp. 386, 389 (S.D.N.Y.1988); *Rios v. Marshall,* 530 F.Supp. 351, 371 (S.D.N.Y.1981).[2] On the other hand, "[a]n individual employed by a foreign state enjoys no FSIA immunity for acts that are 'beyond the scope' of her official responsibilities," i.e., acts that are "personal and private in nature." *Leutwyler,* 184 F.Supp.2d at 287 (quoting *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1197 (S.D.N.Y.1996)); *accord Jungquist,* 115 F.3d at 1027; *Kline,* 685 F.Supp. at 389.

*Tachiona v. United States,* 386 F.3d 205 (2d Cir.2004), cited by Plaintiffs, is both inapposite to this case and non-binding on the question of the FSIA's scope. In *Tachiona,* the plaintiffs asserted claims under the ATS and TVPA alleging that the president and foreign minister of Zimbabwe had subjected them to torture, assault, execution and other acts of violence. *Tachiona,* 386 F.3d at 209. The district court held that the defendants were entitled to both diplomatic and head-of-state immunity. *Tachiona,* 386 F.3d at 210. The latter ruling was predicated on a suggestion of head-of-state immunity filed by the Government, which the district court found "dispositive." *Tachiona,* 386 F.3d at 220. On appeal, the plaintiffs argued that the district court erred in conferring head-of-

**2.** In light of the cited precedent, this Court is unpersuaded by the Government's contention that the FSIA does not apply to individuals and, in its place, the Court should apply the common law that was operative prior to the FSIA's enactment. *See Republic of Austria v. Altmann,* 541 U.S. 677, 701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) ("[I]nterpretation of the

FSIA's reach [is] a pure question of statutory interpretation" that is "well within the province of the Judiciary," meaning the Government's views on the subject "merit no special deference.") "No authority supports the continued validity of the pre-[FSIA] common law" as applied to individuals who are not heads of state. *Chuidian,* 912 F.2d at 1103.

state immunity because the FSIA, as opposed to the executive's suggestion of immunity, governs such determinations and the FSIA was unavailable to the defendants. *Tachiona*, 386 F.3d at 220.

The Court of Appeals held that it had "no occasion to decide whether [the defendants] were protected from suit by head-of-state immunity" under the FSIA because it concluded that the defendants were shielded from suit by diplomatic immunity. *Tachiona*, 386 F.3d at 221. Nevertheless, the Court noted in passing that it had "some doubt as to whether the FSIA was meant to supplant the 'common law' of head-of-state immunity, which generally entailed deference to the executive branch's suggestions of immunity." *Tachiona*, 386 F.3d at 220. The Court reasoned that " '[a]gencies and instrumentalities' ... are defined [by the FSIA] in terms not usually used to describe natural persons," and that "the only reference to heads of state or other foreign officials in the FSIA's legislative history suggest that their immunity is not governed by the [FSIA]." *Tachiona*, 386 F.3d at 221.

■ The only issue before the Court of Appeals in *Tachiona* was whether head-of-state immunity is governed by the FSIA or the common law. Head-of-state immunity involves a different analysis than that conducted for lower ranking officials such as Dichter and, if granted, it affords broader protection to the individual. "A head-of-state recognized by the United States government is absolutely immune from personal jurisdiction in United States courts," regardless of whether the claims arise from official or private acts. *See Lafontant v. Aristide*, 844 F.Supp. 128, 131–32 (E.D.N.Y.1994); *accord First Am. Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1119 (D.D.C.1996); *Alicog v. Kingdom of Saudi Arabia*, 860 F.Supp. 379, 382

(S.D.Tex.1994); *Saltany v. Reagan*, 702 F.Supp. 319, 320 (D.D.C.1988).

The distinction between head-of-state immunity and immunity afforded to lower ranking officials under the FSIA is illustrated by decisional law from this Circuit. For example, *Lafontant v. Aristide* held that the FSIA did not supplant traditional head-of-state immunity and applied the common law in determining that defendant Jean–Bertrand Aristide was immune from suit. *Lafontant*, 844 F.Supp. at 135–37. In doing so, the court expressly distinguished head-of-state immunity from the immunity afforded other foreign officials. The court stated: "There is some support for the application of immunity under the FSIA to individuals as 'instrumentalities' of foreign states. No case has, however, construed 'agency or instrumentality' to include a head-of-state." *Lafontant*, 844 F.Supp. at 136 (internal citations omitted). Indeed, in *Leutwyler*, the court applied the common law in granting head-of-state immunity to Queen Rania of Jordan, but addressed claims against the remaining individual Jordanian defendants under the FSIA. *Leutwyler*, 184 F.Supp.2d at 280; *cf. First Am. Corp.*, 948 F.Supp. at 1119 (holding that the FSIA did not supplant common law head-of-state immunity despite controlling D.C. Circuit precedent that the FSIA applies to individuals acting in their official capacity). Therefore, *Tachiona* addressed a different question than the one presented to this Court.

In any event, the brief discussion of the FSIA in *Tachiona* is non-binding dicta, as the Court of Appeals had "no occasion to decide" whether the FSIA or common law immunity applies to heads of state. To the extent Plaintiffs contend that *Tachiona* should foreclose application of the FSIA to lower ranking officials, absent a controlling and unambiguous declaration to that effect, this Court is persuaded by the over-

whelming weight of decisional authority from this District and from other circuits applying the FSIA more broadly. *See, e.g., In re Terrorist Attacks,* 392 F.Supp.2d at 551; *Kato v. Ishihara,* 239 F.Supp.2d 359, 362 (S.D.N.Y.2002); *Leutwyler,* 184 F.Supp.2d at 286–87; *Bryks,* 906 F.Supp. at 210; *Kline,* 685 F.Supp. at 389; *Rios,* 530 F.Supp. at 371; *see also Velasco,* 370 F.3d at 398–99; *Byrd,* 182 F.3d at 388; *Keller,* 277 F.3d at 815; *Chuidian,* 912 F.2d at 1103; *El–Fadl,* 75 F.3d at 671; *but see Enahoro v. Abubakar,* 408 F.3d 877, 881–82 (7th Cir.2005) (stating that individuals are not "agencies or instrumentalities" under the FSIA). Withdrawal of such immunity would constitute a deviation from the international norm. As noted by the Government in its Statement of Interest:

> [P]arting with this international consensus would threaten serious harm to U.S. interests, by inviting reciprocation in foreign jurisdictions. Given the global leadership responsibilities of the United States, its officials are at special risk of being made the targets of politically driven lawsuits abroad—including damages suits arising from alleged war crimes. The immunity defense is a vital means of deflecting these suits and averting the nuisance and diplomatic tensions that would ensue were they to proceed. It is therefore of critical importance that American courts recognize the same immunity defense for foreign officials, as any refusal to do so could easily lead foreign jurisdictions to refuse such protection for American officials in turn.

(Statement of Interest at 22). This Court holds that individuals acting pursuant to their official capacity are eligible for immunity under the FSIA.

**B.** *Application of the FSIA*

■ Plaintiffs unquestionably sue Dichter in his official capacity. Nothing in the Complaint permits an inference that Dichter's alleged conduct was "personal and private in nature." *Leutwyler,* 184 F.Supp.2d at 287; *see also Belhas v. Ya'Alon,* 466 F.Supp.2d 127, 130–31 (D.D.C.2006) (Israeli official was "agency or instrumentality of the foreign state" under FSIA because "[t]here [was] no allegation that defendant's activities were 'personal or private' in nature"). The caption in this action identifies Dicther as "former Director of Israel's General Security Service," and the body of the Complaint alleges that Dichter participated in formulating and implementing Israel's official anti-terrorist strategy. (Compl.¶ 19.) *See Doe,* 400 F.Supp.2d at 105 (individual Israeli defendants, including Dichter, were immune from suit when "plaintiffs challenge[d] the conduct of the Israeli occupation activities in the West Bank—something that is an official policy of the sovereign State of Israel").

■ Furthermore, the State of Israel has represented to this Court that Dichter's actions were taken "in the course of [his] official duties, and in furtherance of official policies of the State of Israel." (Ayalon Letter at 2.) Courts assign "great weight" to the opinion of a sovereign state regarding whether one of its officials was acting within his official scope. *See In re Terrorist Attacks,* 392 F.Supp.2d at 551; *Leutwyler,* 184 F.Supp.2d at 287; *Rein v. Rein,* No. 95 Civ. 4030(SHS), 1996 WL 273993, at *2 (S.D.N.Y. May 23, 1996). Dichter is entitled to sovereign immunity under the FSIA because he is "being sued solely for actions taken in his official capacity." *Belhas,* 466 F.Supp.2d at 130; *see also In re Terrorist Attacks,* 392 F.Supp.2d at 553 (foreign officials entitled to sovereign immunity for official acts);

*Leutwyler,* 184 F.Supp.2d at 288–89 (same).[3]

### C. *Scope of Lawful Authority*

█ Plaintiffs allege that the extrajudicial killings alleged in the complaint violate *jus cogens* principles of international law. On this basis, Plaintiffs argue that the FSIA does not apply to Dichter because *jus cogens* violations are necessarily beyond the scope of an official's lawful authority. This Court disagrees. Plaintiffs cite several cases in which a foreign official alleged to have violated *jus cogens* principles was denied immunity under the FSIA. However, these officials did not act in their official capacity. None of the cases cited by Plaintiffs involved a situation where, as here, the foreign government had expressly ratified the defendant's actions and affirmed that the defendant was acting pursuant to his official duties. *See, e.g., Hilao v. Estate of Marcos,* 25 F.3d 1467, 1470–72 (9th Cir.1994) (holding that defendant's acts were "taken without official mandate" where the Phillipine government conceded that "Marcos may be held liable for acts done as President"); *Doe v. Qi,* 349 F.Supp.2d 1258, 1287 (N.D.Cal.2004) (no immunity where China "appears to have covertly authorized but publicly disclaimed the alleged human rights violations ... by Defendants Liu and Xia and asserts that such violations are in fact prohibited by Chinese law"); *Cabiri,* 921 F.Supp. at 1197 (defendant "[did] not claim that the acts of torture he is alleged to have committed fall within the scope of his authority"); *Xun-*

*cax v. Gramajo,* 886 F.Supp. 162, 176 n. 10 (D.Mass.1995) ("There is no suggestion that either the past or present governments of Guatemala characterize the actions alleged here as 'officially' authorized."). Dichter plainly acted pursuant to his official duties and, therefore, the FSIA confers immunity on him no less than it would the State of Israel itself. *See Belhas,* 466 F.Supp.2d at 132 (rejecting plaintiffs' *jus cogens* argument in part because "the Israeli government view[ed] the actions described in the complaint as 'sovereign actions' and 'official state acts' ").

█ "Plaintiffs do not ... try to fit their arguments within the framework of the statutory exceptions to immunity under the FSIA." *Belhas,* 466 F.Supp.2d at 132. The FSIA is the sole means for obtaining jurisdiction over an agency or instrumentality of a foreign state, *Nelson,* 507 U.S. at 355, 113 S.Ct. 1471; *Weltover, Inc.,* 504 U.S. at 611, 112 S.Ct. 2160, and it confers automatic immunity unless one of the FSIA's exceptions apply, *see Belhas,* 466 F.Supp.2d at 132; *In re Terrorist Attacks,* 349 F.Supp.2d at 782. Plaintiffs make no attempt to show that Dicther's purported actions fall within an exception. Indeed, courts have analyzed whether *jus cogens* violations implicate FSIA Section 1605(a)(1), which provides that a foreign state "shall not be immune from the jurisdiction of courts in the United States [if] the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). The courts have held

---

**3.** Plaintiffs request additional discovery of "issues of fact raised under Rule 12(b)(1), including evidence of the factual and legal authority on which Defendant relies to support his claim that he was acting within the scope of his authority." (Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, dated Apr. 26, 2006, at 3.) The request is denied. "[I]n light of the evidence presented by the [ ] Defendant[ ] to show that [he] acted only in [his] official capacit[y] and the absence of factual allegations presented by plaintiff[s] to indicate otherwise, plaintiff[s][are] not entitled to discovery on this issue because such discovery would frustrate the significance and benefit of entitlement to immunity from suit." *Rein,* 1996 WL 273993, at *2 (internal quotations omitted); *see also El–Fadl,* 75 F.3d at 671 (denying request for discovery on the issue of sovereign immunity).

that *"[j]us cogens* violations, without more, do not constitute an implied waiver of FSIA immunity" for individuals acting in their official capacity. *Doe,* 400 F.Supp.2d at 105 (individual defendant immune despite *jus cogens* allegations); *cf. Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239, 242–45 (2d Cir.1996) (no *jus cogens* exception to sovereign immunity); *Princz v. Fed. Republic of Germany,* 26 F.3d 1166, 1173–75 (D.C.Cir.1994) (same).

### D.  *TVPA*

▉▉▉ The TVPA provides that "an individual who, under actual or apparent authority, or color of law, of any foreign nation . . . (2) subjects an individual to extra-judicial killing" shall be liable for damages. 28 U.S.C. § 1350 Note, at § 2(a). Plaintiffs assert that the TVPA trumps the FSIA as it applies to individuals, such that an individual's immunity under the FSIA is forfeited when the official's conduct falls within the TVPA. In *Belhas,* the court rejected an identical argument, explaining:

> Because a foreign official is an agency or instrumentality of the foreign state, and agencies and instrumentalities of foreign states are included within the definition of foreign state in the FSIA, the Court concludes that there is no basis in this case to treat individual officials differently from foreign states themselves under the FSIA.

*Belhas,* 466 F.Supp.2d at 131 (internal quotations and citations omitted). This Court agrees. *See Doe,* 400 F.Supp.2d at 104–05 (individual defendants immune under the FSIA despite TVPA claims); H.R.Rep. No. 102–367(1), at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("The TVPA is subject to restrictions in the [FSIA]."). "[N]othing in the [TVPA] purports to override official immunities, such

as the statutory immunity of foreign governments and their instrumentalities, or the common law immunity of heads of state."  Curtis A. Bradley, *The Costs of International Human Rights Litigation,* 2 Chi. J. Int'l L. 457, 463 (2001).  Rather, "immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions," and no exceptions apply here. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 436, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

Plaintiffs contend that immunizing individuals acting in their official roles would conflict with the language of the TVPA, which expressly provides liability for those acting under "actual" authority of a foreign nation.  This Court perceives no such conflict, because not all individuals acting in their official capacity will be immune under the FSIA. "In a case where an FSIA exception applies, a foreign state official acting in his official capacity could be sued under the TVPA." *Belhas,* 466 F.Supp.2d at 131.  Plaintiffs offer no compelling reason why statutory immunity should be abrogated in favor of the TVPA. The facts of this case do not warrant such an outcome.

### III.  *Political Question Doctrine*

▉▉▉ Even if the FSIA were inapplicable, this Court would dismiss the action pursuant to the political question doctrine. The Supreme Court in *Baker v. Carr* articulated six situations in which a nonjusticiable political question may exist:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving [the issue]; or (3) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a

court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57, 70 (2d Cir.2005). Whether the court is presented with a political question requires a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and the possible consequences of judicial action." *Baker*, 369 U.S. at 211, 82 S.Ct. 691; *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir.1995) (whether a political question is presented must be weighed "on a case-by-case basis").

▮▮▮ The *Baker* factors—and particularly factors four and six—strongly suggest that this action involves a political question. The defendant is a high-ranking official of Israel, a United States ally. The Complaint criticizes military actions that were coordinated by Defendant on behalf of Israel and in furtherance of Israeli foreign policy. For this reason, both Israel and the State Department, whose opinions are entitled to consideration, urge dismissal of this action.[4] *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (noting that in some cases "there is a strong argument that federal courts

should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Altmann*, 541 U.S. at 702, 124 S.Ct. 2240 ("[S]hould the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy."). Plaintiffs contend that because the administration did not condone the al-Daraj bombing, adjudication of this matter could not exhibit a lack of respect for the political branches. This Court disagrees. The Government has urged the Court to dismiss this action regardless of whether it approved of the attack. Moreover, Plaintiffs do not limit their claims to the Defendant or the al-Daraj bombing. *See Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir.1997) (rejecting plaintiffs' "effort to cast their suit as a common negligence action directed at lower-level military operatives" where "[t]he allegations of the complaint launch[ed] a far more sweeping assault on the Navy's practices than [plaintiffs] acknowledge[d]"). For example, the Complaint alleges that "since at least November 2000, the State of Israel has systematically engaged in so-called 'targeted killings' ... of 'suspected terrorists'" (Compl. ¶ 17 (emphasis added)); that the al-Daraj attack was "part of a pattern and practice of systematic human rights violations" (Compl.¶ 63); that Ditcher "developed, implemented, and escalated" Israel's targeted killing policy (Compl.¶ 19); and that as a general matter, targets are killed "with-

---

4. For purposes of the political question inquiry, the Court may take judicial notice of the "official policy and opinion" of the United States and Israel. *Sarei v. Rio Tinto, PLC*, 221 F.Supp.2d 1116, 1182–83 (C.D.Cal.2002); *see also Kadic*, 70 F.3d at 250 (considering State Department statement of interest on a motion to dismiss predicated on the political question doctrine).

out a fair legal process to examine the allegations against them" (Compl.¶ 17).

Furthermore, the Israeli policy criticized in the Complaint involves the response to terrorism in a uniquely volatile region. This Court cannot ignore the potential impact of this litigation on the Middle East's delicate diplomacy. *See Corrie v. Caterpillar, Inc.,* 403 F.Supp.2d 1019, 1032 (W.D.Wash.2005) (holding that request to enjoin sale of bulldozers used by Israel in extrajudicial killings was a political question because it "challenge[d] the official acts of an existing government in a region where diplomacy is delicate"). As noted by the Government, the claims asserted by Plaintiffs "threaten to enmesh the courts in policing armed conflicts across the globe—a charge that would exceed judicial competence and intrude on the Executive's control over foreign affairs." (Statement of Interest at 3.) Allowing this case to proceed "would undermine the Executive's ability to manage the conflict at issue through diplomatic means, or to avoid becoming entangled in it at all." (Statement of Interest at 45.) Consideration of the case against this unique backdrop would impede the Executive's diplomatic efforts and, particularly in light of the Statement of Interest, would cause the sort of intra-governmental dissonance and embarrassment that gives rise to a political question. *Doe,* 400 F.Supp.2d at 111–13 (holding that claims against Israeli military officials for extrajudicial killings involved a political question)

Plaintiffs cite a handful of cases in which the courts have adjudicated issues pertaining to the Middle East conflict. *See Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 49–50 (2d Cir.1991) (tort claim against PLO for alleged hijacking of a cruise liner); *Ungar v. Palestine Liberation Org.,* 402 F.3d 274, 280 (1st Cir.2005) (claim against PLO under the Antiterror-

ism Act for sponsoring terrorism); *Biton v. Palestinian Interim Self–Government Auth.,* 310 F.Supp.2d 172, 183–85 (D.D.C. 2004) (same); *Sharon v. Time Inc.,* 599 F.Supp. 538, 547 (S.D.N.Y.1984) (libel action brought by Israeli official in U.S. courts). However, none of these actions involved claims asserted against a sovereign state, let alone a United States ally, with the unique foreign policy implications presented here.

Neither did these lawsuits elicit a request for dismissal from the Department of State and the government of the foreign state. For this reason, Plaintiffs' citation to *Kadic* is also misplaced. In *Kadic,* plaintiffs were victims of atrocities allegedly coordinated by defendant Radovan Karadzic, former President of the self-proclaimed Bosnian–Serb republic within Bosnia–Herzegovina. *Kadic,* 70 F.3d at 236–37. The Court of Appeals rejected Karadzic's contention that the case presented a political question. *Kadic,* 70 F.3d at 248–51. However, the *Kadic* court highlighted that the State Department had "expressly disclaimed any concern that the political question doctrine should be invoked." *Kadic,* 70 F.3d at 250; *see also Sarei v. Rio Tinto, PLC,* 456 F.3d 1069, 1083 n. 13 (9th Cir.2006) (discounting a State Department statement of interest that encouraged dismissal when the statement was outdated and the foreign state purportedly requested that the action proceed in federal court); *Klinghoffer,* 937 F.2d at 49–50 (no political question where "both the Executive and Legislative Branches have expressly endorsed the concept of suing terrorist organizations in federal court"); *Sharon,* 599 F.Supp. at 549–50 (no political question where neither the Government nor Israel requested that the action be dismissed). The opposite is true here, as the State Department has advocated forceful-

ly for the dismissal of this action based in part on foreign policy concerns.

Plaintiffs bring this action against a foreign official for implementing the anti-terrorist policy of a strategic United States ally in a region where diplomacy is vital, despite requests for abstention by the State Department and the ally's government. "[T]he character of [such a] claim[ ] is, at its core ... peculiarly volatile, undeniably political, and ultimately nonjusticiable." *Doe*, 400 F.Supp.2d at 112.[5]

### CONCLUSION

Accordingly, Defendant's motion to dismiss is granted. The Clerk of the Court is directed to mark this case closed.

SO ORDERED.

5. Because this Court dismisses the Complaint pursuant to the FSIA and the political question doctrine, it need not address Defendant's argument that, in the alternative, this action is barred under the act of state doctrine.