**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GEORGE VELASCO,
                    *Plaintiff-Appellant,*

v.

THE GOVERNMENT OF INDONESIA, a
foreign state; THE NATIONAL DEFENSE
SECURITY COUNCIL OF THE
REPUBLIC OF INDONESIA-JAKARTA, an
agency or instrumentality of a
foreign state; H.A. CHALID
MAWARDI, Ambassador Republic of
Indonesia, in his official capacity;
IBNU HARTOMO IN HIS OFFICIAL
CAPACITY FOR THE NATIONAL DEFENSE
SECURITY COUNCIL OF THE
REPUBLIC OF INDONESIA-JAKARTA,
                    *Defendants-Appellees,*

and

JOHN DOES, 1 through 5, in their
official capacities as Agents and
Agencies of the Government of
Indonesia; ABC CORPORATIONS, 1
through 5, in their official capacities
as Agents and Agencies of the
Government of Indonesia; DEF
PARTNERSHIPS, in their official
capacities as Agents and Agencies
of the Government of Indonesia;
LMN ASSOCIATIONS, in their official
capacities as Agents and Agencies
of the Government of Indonesia;

No. 02-1980

XYZ GOVERNMENTAL AGENCIES, in
their official capacities as Agents
and Agencies of the Government of
Indonesia,

*Defendants.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-00-378)

Argued: December 4, 2003

Decided: June 3, 2004

Before WILKINS, Chief Judge, TRAXLER, Circuit Judge,
and Richard D. BENNETT, United States District Judge
for the District of Maryland, sitting by designation.

---

Affirmed by published opinion. District Judge Bennett wrote the
opinion, in which Chief Judge Wilkins and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Clinton Louis Rudisill, RUDISILL & ASSOCIATES,
P.A., Fayetteville, North Carolina, for Appellant. Francis Anthony
Vasquez, Jr., WHITE & CASE, L.L.P., Washington, D.C., for Appel-
lees. **ON BRIEF:** Carolyn B. Lamm, Frank Panopoulos, Nicole Erb,
WHITE & CASE, L.L.P., Washington, D.C., for Appellees.

**OPINION**

BENNETT, District Judge:

The Plaintiff, George Velasco, brought this action to compel the payment of a promissory note (the "Promissory Note" or "Note"), issued by former staff members of the National Defense Security Council of the Republic of Indonesia ("NDSC") in the amount of US$2.8 million, against the NDSC, the Government of Indonesia, H.A. Chalid Mawardi, Indonesia's former Ambassador to Syria, former NDSC official Ibnu Hartomo, and various other unnamed government officials and agencies, all in their official capacities (collectively, the "Defendants"). The District Court entered an Order granting the Defendants' Motion to Dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1441(d), and 1602-1611. The Plaintiff appeals that Order. Finding no reversible error, we affirm the decision of the District Court.

## I.   Facts

On October 27, 1985, former NDSC Deputies for Development and Long-Term Planning, Ibnu Hartomo and Soebagyo Soedewo, issued a series of 505 Indonesian promissory notes collectively valued at US$3.2 billion. The notes bear the crest of the NDSC and are payable in U.S. Dollars to the "Central Establishment for Trade and Investment — Beirut and or their Bearer" in "New York." Hartomo utilized the offices of the Syrian Government to validate and effect the issuance of the notes.[1] At a signing ceremony at a hotel in Damascus, Syria, attended by the President of the Central Bank of Syria, Hartomo signed the notes, and Mawardi certified that they were "Official/Governmental." A representative of the Syrian Ministry of Foreign Affairs notarized Mawardi's signature on the notes. The Central

---

[1]Two other actions brought by holders of promissory notes set forth essentially the same factual background of this case. *See Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997); *Storr v. Nat'l Def. Sec. Council of the Republic of Indonesia*, No. 95 CIV 9663, 1997 WL 633405, at *1 (S.D.N.Y. Oct. 14, 1997), *aff'd*, 164 F.3d 619 (2d Cir. 1998).

Establishment for Trade and Investment then indorsed the notes, rendering them bearer in form. Thereafter, Hartomo exchanged the notes for notes issued by Hassan Zubaidi, a Syrian-based "financier." Zubaidi placed some of the notes in the international market.

Hartomo admitted that at the time he issued the notes, he knew he was not authorized to do so. The former NDSC Secretary General, Achmad Wiranatakusumah, declared that two "letters of authorization" purportedly signed by him and empowering Hartomo and Soedewo to issue the instruments on behalf of the NDSC were forgeries. Similarly, Ambassador Mawardi had not received an express delegation of authority from the Ministry of Finance or the Department of Foreign Affairs and, therefore, lacked the authority to confirm or legalize the notes.[2] The notes themselves contain numerous facial irregularities and are distinguishable from notes issued by Bank Indonesia or the Indonesian Ministry of Finance, the only agents under Indonesian law with authority to issue promissory notes binding on the Government. Among other things, the notes lack a statement that they were issued under the authority of those entities, fail to designate a specific payment agent, place of payment, or exact amount and method of repayment, and omit other key terms.

In late 1985, the NDSC became aware of reports that the notes

---

[2]Under Indonesian law, an Ambassador does not have the inherent power to execute a loan or other financial instrument to receive foreign credit on behalf of the Republic of Indonesia. An ambassador must request and receive clearance from an interdepartmental committee established to review foreign financial credits. Upon receipt of such clearance, the Minister of Foreign Affairs issues "Full Powers" to the Ambassador. In cases where the Ambassador seeks authorization to execute a foreign credit under Presidential Decree No. 59/1972, the Minister of Finance must transmit a specific written delegation of authority to the Minister of Foreign Affairs. *See* Anwar Aff. at 2, JA 498.

Mawardi's attempted confirmation of the notes as "official/governmental" was meaningless and contrary to Indonesian law with respect to the legalization of Government documents. A document is legalized by the Department of Justice and the Department of Foreign Affairs by punching a hole through it, attaching a ribbon, and placing a hot wax seal on it to prevent alteration. *Id.* at 3, JA 499.

were in circulation. On December 20, 1985, the Ministry of Finance issued a letter to certain Government ministerial departments alerting them of the alleged NDSC promissory notes, advising them that only the Ministry of Finance and Bank Indonesia are authorized to obtain foreign loans on behalf of the Republic of Indonesia, and requesting an investigation into the matter. The Ministry of Finance and Bank Indonesia determined that the purported NDSC notes were not issued in accordance with Indonesian law and, therefore, were not binding on the Republic of Indonesia. On January 21, 1986, the NDSC Secretary General sent a confidential memorandum to the Governor of Bank Indonesia stating that the NDSC had no authority to issue promissory notes and that it did not and could not authorize any NDSC official, including Hartomo and Soedewo, to issue any promissory notes.

The Secretary General requested Bank Indonesia to issue notices announcing that the purported NDSC notes were void and invalid. On January 21, 1986, February 4, 1986, and March 2, 1987, Bank Indonesia issued circulars by telex alerting all foreign-exchange banks in Jakarta, Bank Indonesia's branch offices, and Bank Indonesia's Representative Offices worldwide of the unauthorized notes and advising them the issuance of such notes was conducted at the risk and responsibility of the individual issuers. On March 14, 1986, Hartomo was discharged from his position at the NDSC. On April 30, 1987, the NDSC issued a press release confirming that it was not authorized to issue promissory notes and that the purported NDSC notes were unauthorized and illegal. Subsequently, the international press, including the New York Times, the Asian Wall Street Journal, and Forbes Magazine, reported widely on the fake notes and Bank Indonesia's repeated repudiation of them. It is undisputed that these events occurred prior to the time Velasco purchased his Note.

Velasco purchased his Note in Panama on September 14, 1987 from Patrizion Bucciarelli, an Italian businessman, for US$1.8 million and approximately $300,000 in antique gold coins. When he presented the Note for payment at Banaico Bank in Panama City on November 16, 1987, one day after the Note's maturity date, the bank informed him that Indonesia refused payment. Velasco presented the Note for payment on subsequent occasions at the Offices of the Indo-

nesian Consulate General, which informed him that the Note was unauthorized and not payable.

Velasco subsequently sued to enforce payment on the Note. His Amended Complaint states claims for fraud, negligent misrepresentation, unfair and deceptive trade practices, and breach of contract and demands specific performance as well as monetary damages. The Defendants moved to dismiss for lack of subject matter and personal jurisdiction, improper venue, insufficient service of process, and failure to state a claim upon which relief could be granted. The District Court held that the Plaintiff failed to prove that any former staff members of the NDSC had either actual or apparent authority to issue the Note. Accordingly, the Court held that the acts of the NDSC with respect to the issuance of the Note were not the acts of a foreign state and that the "commercial activity" exception to the FSIA did not apply. The District Court determined the Defendants to be immune from suit pursuant to the FSIA and granted the motion to dismiss for lack of subject matter jurisdiction without reaching the Defendants' alternate bases for dismissal. Velasco contends that the District Court erred in ruling that the acts of the Defendants in conjunction with the issuance of the Note did not constitute "commercial activity of a foreign state" which abrogates sovereign immunity under the FSIA.

## II.   Analysis

### A.

The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-39 (1989). Section 1330(a) of Title 28, United States Code provides that

> [t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605-1607 of this title or under any applicable international agreement.

Section 1604 of Title 28 provides that "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of [the] Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." These provisions condition the subject matter jurisdiction of the federal and state courts upon the existence of one of the exceptions to immunity set forth in the FSIA. *Amerada Hess*, 488 U.S. at 434; *Schlumberger Indus., Inc. v. Nat'l Sur. Corp.*, 36 F.3d 1274, 1279 n.10 (4th Cir. 1994); *Security Pacific Nat'l Bank v. Derderian*, 872 F.2d 281, 284 (9th Cir. 1989). Once a plaintiff offers evidence that an exception to immunity applies, the defendant bears the burden of proving by a preponderance of the evidence that the exception does not apply. *Gerding v. Republic of France*, 943 F.2d 521, 524 (4th Cir. 1991); *see also Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 324 (9th Cir. 1996).

Velasco and the Defendants agree that the sole exception pertinent to this case is the "commercial activity" exception set forth at 28 U.S.C. § 1605(a)(2), which provides that a foreign state shall not be immune in any action

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The Defendants apparently do not contest that the issuance of the Note was a commercial activity that caused a direct effect in the United States. Rather, they argue that the issuance of the Note was not a commercial activity *of a foreign state*. We must determine, therefore, whether the unauthorized acts of Hartomo and Mawardi in issuing the notes under color of authority from the NDSC are sufficient to deprive the Government of Indonesia or the NDSC of their sovereign immunity.

B.

Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard

the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Evans v. B.F. Perkins Co.*, 166 F.3d 142, 147 (4th Cir. 1999). "Where the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case before trial.'" *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997) (quoting *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)(internal quotation omitted)). We review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom *de novo*. *Id*. at 1028; *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 930 (2d Cir. 1998).

C.

Under the FSIA, the term "foreign state" is defined to include "a political subdivision of a foreign state or an agency of instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is in turn defined as

> any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

28 U.S.C. § 1603(b). The Government of Indonesia and the NDSC are "foreign states" within the meaning of the FSIA. *Phaneuf*, 106 F.3d at 306 n.1; *Storr*, 1997 WL 633405, at *2 n.2.

Although the statute is silent on the subject, courts have construed foreign sovereign immunity to extend to an individual acting in his official capacity on behalf of a foreign state. *See, e.g., Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101-03 (9th Cir. 1990) (interpreting section 1603(b) to include individuals sued in their official capacity); *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 496 (9th Cir. 1992), *cert. denied, Marcos-*

*Manotoc v. Trajano*, 508 U.S. 972 (1993) (same); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) (individual sued for actions on behalf of government bank was immune from suit under FSIA); *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.*, 182 F.3d 380, 388 (5th Cir. 1999) (FSIA protects individuals acting within their official capacity as officers of corporations considered foreign sovereigns); *Bryks v. Canadian Broadcasting Corp.*, 906 F. Supp. 204, 210 (S.D.N.Y. 1995) (immunity extends to agents of a foreign state acting in their official capacities). Claims against the individual in his official capacity are the practical equivalent of claims against the foreign state. *Chuidian*, 912 F.2d at 1101. The FSIA, however, does not immunize an official who acts beyond the scope of his authority. *Id.* at 1106.

This narrow, judicially-created expansion of foreign sovereign immunity models federal common law relating to derivative U.S. sovereign immunity. *See Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (acknowledging Fifth Circuit's analogy of derivative foreign sovereign immunity to "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity"); *Chuidian*, 912 F.2d at 1106 (comparing foreign sovereign immunity to U.S. sovereign immunity). Because the power of governmental officials is both prescribed and limited by constitutional or statutory law, courts analyzing the sovereign immunity of the United States have held consistently that the act of an agent beyond what he is legally empowered to do is not binding upon the government. *See, e.g., The Floyd Acceptances*, 7 U.S. 666, 681 (1869) (Government could not be compelled to accept bills of exchange issued by Secretary of War where there was no statutory authority for their issuance); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden.").

Moreover, courts have imposed an affirmative obligation upon a person transacting business with an agent of the United States to determine whether the agent is vested with authority to bind the Government. *See, e.g., The Floyd Acceptances*, 74 U.S. at 676 (purchaser

of commercial paper issued by a government official which purports to bind the government has an affirmative obligation to determine whether the agent has express authority to bind the government); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383-84 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); *Atlantic Tobacco Co. v. United States*, 249 F. Supp. 661, 663 (D.S.C. 1966) ("In dealings with the government, unlike those with private parties, one is charged with knowledge of the extent of the actual authority of the government's contracting agent since no agent . . . can hold out to have any authority not sanctioned by law . . . ."). It is insufficient that the person dealing with the agent believes the agent has authority. *United States v. Vanhorn*, 20 F.3d 104, 112 n.19 (4th Cir. 1994) (oral representations by government officer cannot modify statutory contract); *Doe v. Civiletti*, 635 F.2d 88,96 (2d Cir. 1980) ("In spite of its rigor, the actual authority doctrine has been scrupulously followed.").

The Ninth Circuit, in *Phaneuf*, specifically held that "an agent must have acted with actual authority in order to invoke the commercial activity exception against a foreign state." 106 F.3d at 308. We acknowledge that the Second Circuit has taken a different view. It has held, without substantial explanation, that jurisdiction exists over a foreign state if its agents act with either actual or apparent authority. *See First Fidelity Bank, N.A. v. Government of Antigua & Barbuda — Permanent Mission*, 877 F.2d 189, 194-96 (2d Cir. 1989); *Storr*, 1997 WL 633405, at *2-3. Whether a third party reasonably perceives that the sovereign has empowered its agent to engage in a transaction, however, is irrelevant if the sovereign's constitution or laws proscribe or do not authorize the agent's conduct and the third party fails to make a proper inquiry. We conclude that a foreign official's manifestation of authority to bind the sovereign is insufficient to bind the sovereign.[3]

---

[3]Even if the apparent authority doctrine were to apply in this case, Velasco would not be entitled to relief. Apparent authority depends upon some conduct by the principal, communicated to a third party, that reasonably causes the third party to believe that the agent has authority to conduct a particular transaction. *See Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000); *Restate-*

In light of the above authority, we concur with the position of the Ninth Circuit and hold that the commercial activity exception may be invoked against a foreign state only when its officials have actual authority. *See In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d at 497; *Phaneuf*, 106 F.3d at 308. We turn, then, to the question of whether Hartomo and Mawardi possessed actual authority to issue Velasco's Note to determine whether they acted in their official, as opposed to their individual, capacities.[4]

D.

The District Court found that Velasco failed to produce "evidence that the individual defendants or some other governmental agent had the authority of the Government to issue the Note." JA 508-509. That finding was not clearly erroneous. The Defendants have offered extensive affidavits and supporting documentation that the individual Defendants had no authority to issue the Note. The Defendants having established a *prima facie* case of immunity, "the burden of production

---

*ment (Second) of Agency* § 27. The Government of Indonesia never represented to third parties that Hartomo and Mawardi were authorized to issue the promissory notes and publicly and repeatedly repudiated the notes after it discovered that they had been issued. *See Storr*, 1997 WL 633405, at *3 (finding that the transaction involving the issuance of the promissory notes satisfied none of the requirements of a finding of apparent authority). Rather, the indicia of authority, such as the signing ceremony in Damascus and the papers purporting to document the transaction, were created by the makers of the notes. It is well-established that an agent may not create his own apparent authority. *Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996).

[4]As the Ninth Circuit did in *Phaneuf*, we distinguish the issue here from Velasco's argument pursuant to *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983), that the NDSC is the alter-ego of the Government of Indonesia. "Our concern . . . is not the level of control a foreign state must exercise over an agency before we will attribute the misdeeds of the agency to the foreign state. Rather, we focus on whether the action of an agent that exceeds the scope of his authority should be attributable to the foreign state." *Phaneuf*, 106 F.3d at 307 n.3.

shifts to the plaintiff to offer evidence that an exception applies." *Phaneuf*, 106 F.3d at 307. Velasco failed to meet this burden.

Velasco's reliance on two "letters of authorization" purportedly executed by the NDSC Secretary General, Achmad Wiranatakusu-mah, empowering Hartomo and Soedewo to issue and sign promissory notes for loans in United States currency and to handle business transactions on behalf of the NDSC is undermined by Wiranatakusu-mah's Declarations of May 6, 1995 and December 19, 1997 that he never signed those documents. Had Hartomo actually received the purported authorization, it would have been meaningless, because the NDSC and the Secretary General have no authority to seek or obtain funding from foreign sources. *See Storr*, 1997 WL 633405, at *2 ("Plaintiff's unsupported argument that the signers of the notes had been authorized to do so by the Secretary General of the NDSC, even if true, is unavailing, as the Secretary General himself lacked any legal authority to approve such an issuance.").

The NDSC was established by Presidential Decree as an advisory board to assist the President in determining national security and defense policy. Law on Defense No. 20/1982; Pres. Decree No. 51/1970. One of the functions of the NDSC is to "conduct studies on national resilience from the aspect of national security." The operating expenses of the NDSC are funded entirely from the State budget, and the NDSC, as a "non-departmental government institution," is prohibited from seeking or accepting offers of foreign credit.[5] Pres. Decree Nos. 51/1970, 59/1972. Pursuant to Indonesian law, only the Ministry of Finance and Indonesia's central bank, Bank Indonesia, are authorized to incur debt from a foreign source on behalf of the Republic of Indonesia. *See* Pres. Decree No. 59/1972; Min. of Fin. Decree No. KEP-261/M/IV/1973; Pres. Letter dated June 4, 1975.

---

[5]Non-departmental governmental institutions are prohibited from seeking or accepting foreign credits from sources other than international agencies or the Intergovernmental Group on Indonesia. *See* Pres. Decree No. 59/1972. A "foreign credit" is defined in part as "all loans which give rise to an obligation to repay [funds] abroad in foreign currency . . . based on the issuance of bonds [or] promissory notes." Min. of Fin. Decree No. 261/1973. Velasco's Note is clearly a foreign credit within the meaning of Decree Nos. 261/1973 and 59/1972, because it is payable in "New York" in U.S. Dollars.

In addition, pursuant to Presidential Decree No. 17/1978, the Ministry of Finance is the only agency authorized to issue promissory notes on behalf of the Republic of Indonesia in connection with borrowing from foreign sources. However, the Minister of Finance may delegate authority to execute such loan transactions. "Where a transaction may involve both a commercial loan and the issuance of notes, in practice, the Minister of Finance grants a power of attorney to Bank Indonesia to execute the document." Gautama Op. at 9, JA 95. The approval of the Minister of Finance is a condition to the validity and enforceability of the foreign credit. *Id*. at 9-10, JA 95-96. Because the NDSC is prohibited as a matter of Indonesian law from obtaining foreign credits by issuing promissory notes, the Minister of Finance cannot delegate his authority to the NDSC. Similarly, because the NDSC did not have the authority to issue Velasco's Note, it could not delegate any authority to Hartomo.

Unlike employees of the NDSC, Ambassadors may in certain circumstances engage in foreign loan or commercial transactions on behalf of the Government of Indonesia. Haryono Decl. at 1-2, JA 225-26. However, Ambassador Mawardi, who never obtained a power of attorney from the Ministry of Finance or "Full Powers" from the Department of Foreign Affairs, lacked the authority to confirm or legalize the notes. His actions at the signing ceremony in Damascus were *ultra vires* and not binding on the Government of Indonesia. *See id*. at 2, JA 226 ("If an ambassador signs a loan document without obtaining "Full Powers," he signs on behalf of himself. He could not bind the Republic of Indonesia.").

By issuing the notes, the individual Defendants acted ultra vires and in violation of Indonesian law. As a consequence, the issuance of the notes cannot be characterized as the commercial activity of a foreign state which divests the NDSC or the Government of Indonesia of their sovereign immunity. Because Velasco did not sue the individual Defendants in their individual capacities, but rather sued Hartomo and Mawardi in their official capacities, the District Court properly dismissed the claims.

## E.

Velasco's remaining arguments that the Government of Indonesia either ratified the transaction involving the promissory notes after

their issuance or is estopped from denying agency by its failure to take reasonable steps to notify others or to cancel the notes, if not waived by his failure to raise them below, are unsupported by the record. The evidence establishes that the Government of Indonesia publicly and repeatedly declared the notes invalid through Bank Indonesia's issuance of circulars, which conformed with the bank's customary practice, and the NDSC's own April 30, 1987 press release. A proper inquiry by Velasco prior to his purchase of the Note on September 14, 1987 would have revealed that the Note was invalid, particularly in light of the press reports disclosing the prosecutions of persons involved in schemes to sell the fraudulent notes and Bank Indonesia's repeated rejection of the notes. Ratification under Indonesian law requires a written act by a person with authority in the first instance to perform the act. *See* Supp. Gautama Decl. ¶¶ 29-31, JA 407-09. Velasco has failed to offer any evidence that any Indonesian official with actual authority to issue the notes, such as the President or the Minister of Finance, manifested an intention to ratify the notes.

## III.   Conclusion

Because the Defendants are immune from suit under the FSIA and the commercial activity exception does not apply, the District Court properly dismissed the claims against the Defendants for lack of subject matter jurisdiction. Accordingly, the judgment is

*AFFIRMED.*