Affirmed by Supreme Court, June 1, 2010

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BASHE ABDI YOUSUF; OFFICER JOHN
DOE 1; JANE DOE 1; JOHN DOE 2;
JOHN DOE 3; JOHN DOE 4; AZIZ
DERIA,

       *Plaintiffs-Appellants,*

       v.

MOHAMED ALI SAMANTAR,

       *Defendant-Appellee.*

---

ALLARD K. LOWENSTEIN
INTERNATIONAL HUMAN RIGHTS
CLINIC, Yale Law School;
AMERICAN FRIENDS SERVICE
COMMITTEE; BOSTON CENTER FOR
REFUGEE HEALTH AND HUMAN
RIGHTS; CONSISTENT LIFE;
EARTHRIGHTS INTERNATIONAL;
DOLLY FILARTIGA; FLORIDA
CENTER FOR SURVIVORS OF
TORTURE; GLOBAL LAWYERS AND
PHYSICIANS; HUMAN RIGHTS FIRST;
HUMAN RIGHTS WATCH;
MARYKNOLL OFFICE OF GLOBAL
CONCERNS; MUSLIM PUBLIC AFFAIRS
COUNCIL; SISTER DIANNA ORTIZ;

No. 07-1893

PROGRAM FOR SURVIVORS OF
TORTURE AND SEVERE TRAUMA;
PROGRAM FOR TORTURE VICTIMS;
ROCKY MOUNTAIN SURVIVORS
CENTER; SURVIVORS OF TORTURE,
INTERNATIONAL; THE SHALOM
CENTER; TORTURE ABOLITION AND
SURVIVORS SUPPORT COALITION
INTERNATIONAL; WORLD
ORGANIZATION FOR HUMAN RIGHTS
USA; INTERNATIONAL RIGHTS
ADVOCATES; INTERNATIONAL HUMAN
RIGHTS CLINIC, Human Rights
Program of Harvard Law School;
UNITED STATES MEMBER OF
CONGRESS AND LAW PROFESSORS,

*Amici Supporting Appellants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:04-cv-01360-LMB)

Argued: September 23, 2008

Decided: January 8, 2009

Before TRAXLER, KING, and DUNCAN, Circuit Judges.

Reversed and remanded by published opinion. Judge Traxler
wrote the opinion, in which Judge King joined. Judge Duncan
wrote a separate concurring opinion.

## COUNSEL

**ARGUED:** Tara M. Lee, COOLEY, GODWARD & KRON-ISH, L.L.P., Reston, Virginia, for Appellants. Frederick B. Goldberg, Bethesda, Maryland, for Appellee. **ON BRIEF:** Robert R. Vieth, Sherron N. Thomas, COOLEY, GODWARD & KRONISH, L.L.P., Reston, Virginia; Maureen P. Alger, COOLEY, GODWARD & KRONISH, L.L.P., Palo Alto, California; Pamela Merchant, Moira Feeney, CENTER FOR JUSTICE & ACCOUNTABILITY, San Francisco, California, for Appellants. Julian H. Spirer, SPIRER & GOLDBERG, P.C., Bethesda, Maryland, for Appellee. Tyler Giannini, HARVARD LAW SCHOOL, International Human Rights Clinic, Human Rights Program, Cambridge, Massachusetts, for Torture Survivors Support Organizations, Human Rights Organizations, Religious Organizations and Torture Survivors and Their Family Members, Amici Supporting Appellants. Deena R. Hurwitz, Germaine S. Dunn, Kerry M. Shapleigh, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for United States Member of Congress and Law Professors, Amici Supporting Appellants.

## OPINION

TRAXLER, Circuit Judge:

Plaintiffs, all of whom are natives of Somalia, brought this action under the Torture Victim Protection Act of 1991, *see* Pub. L. 102-256, 106 Stat. 73 (1992), and the Alien Tort Statute, *see* 28 U.S.C. § 1350, seeking to impose liability against and recover damages from Defendant Mohamed Ali Samantar for alleged acts of torture and human rights violations committed against them by government agents commanded by Samantar during the regime of Mohamed Siad Barre. The district court concluded that Samantar enjoys immunity under the Foreign Sovereign Immunities Act ("FSIA"), *see* 28

U.S.C. §§ 1602-1611, and dismissed the action for lack of subject matter jurisdiction.

For the reasons set forth below, we conclude that the FSIA does not apply to individuals and, as a result, Samantar is not entitled to immunity under the FSIA. Because the FSIA does not apply in this case, it consequently does not deprive the district court of jurisdiction. Accordingly, we reverse the ruling of the district court dismissing for lack of subject matter jurisdiction under the FSIA and remand this action for further proceedings.

## I.

### A.

Plaintiffs all claim to have suffered torture or other abuses in violation of international law at the hands of Somali soldiers or other government agents under the general command of Samantar. Samantar became a high-ranking government official in Somalia as a result of his participation in a socialist coup staged by General Mohamed Barre in 1969. According to plaintiffs, "[p]ower was assumed by the Supreme Revolutionary Council (SRC), which consisted primarily of the Army Officers who had supported and participated in the coup, including Defendant Samantar." J.A. 32. In order to squelch potential opposition to its seizure of power, the SRC outlawed political parties and any organization not sanctioned by the government, and the SRC "systematically favored its own clans and oppressed other clans." J.A. 32. In particular, plaintiffs allege that the military government brutally oppressed the generally prosperous and well-educated Isaaq clan, which the government viewed as a threat, and imposed measures intended to harm the clan politically and economically.

Beginning in the late 1970s, opposition to the Barre regime developed within the disfavored clans and grew among the

general citizenry following Somalia's unsuccessful war against Ethiopia over the Ogaden territory. The military leadership reacted by imposing harsh control measures against government opponents, including the alleged commission of "numerous atrocities against ordinary citizens" in order to "terrorize the civilian population and to deter it from supporting the growing opposition movements." J.A. 33. Plaintiffs allege that government intelligence agencies, including the National Security Service ("NSS") and the military police, engaged in "the widespread and systematic use of torture, arbitrary detention and extrajudicial killing against the civilian population of Somalia." J.A. 33.

Three of the plaintiffs allege that they were personally subjected to this brutality. Plaintiff Bashe Abdi Yousuf, a member of the Isaaq clan, claims that NSS agents, suspecting him of anti-government activities, abducted him and tortured him by various methods, including electric shock and "the Mig," a means of torture whereby Yousuf's hands and feet were bound together in the air behind his back and a heavy rock was placed on his back. Plaintiff Jane Doe, also an Isaaq clan member, alleges that in 1985, she was abducted from her family home in Hargeisa by NSS agents, repeatedly tortured and raped, beaten to the point that she could not walk, and placed in solitary confinement for three and a half years. Finally, plaintiff John Doe II, also born into the Isaaq clan, alleges that, although he was a non-commissioned officer in the Somali National Army, he was arrested in 1988 with other Somali soldiers who were Isaaq clansmen and then shot during a mass execution. Doe survived his non-fatal wound by hiding under a pile of bodies.

The remaining plaintiffs are pursuing claims as personal representatives of the estates of family members allegedly killed by government agents. Plaintiff Aziz Mohamed Deria alleges that his father and brother were tortured and killed by soldiers based on his family's affiliation with the Isaaq clan. Plaintiff John Doe I, an Isaaq clansman, asserts that his two

brothers were abducted by government forces while tending the family's livestock and then executed.

Plaintiffs do not allege that Samantar personally committed these atrocities or that he was directly involved, but they claim that the responsible government agents operated against them and other civilians "with the tacit approval and permission of the Armed Forces and their commander, Defendant Samantar," J.A. 33, who served as Somalia's Minister of Defense from January 1980 to December 1986, and as Prime Minister from January 1987 to September 1990. Regardless of whether the alleged acts occurred during Samantar's tenure as Prime Minister or his stint as Minister of Defense, plaintiffs claim Samantar is subject to liability because, in either capacity, he knew or should have known about this conduct and, essentially, gave tacit approval for it.

Ultimately, any oppression of Somali civilians ended in January 1991, when the Barre regime collapsed and high ranking officials, including Samantar, fled Somalia. Samantar ended up in Virginia, where the plaintiffs, some of whom apparently are naturalized American citizens, found him.

B.

Plaintiffs brought this action for damages under the auspices of two statutes. First, plaintiffs seek to impose liability against Samantar under the Alien Tort Statute ("ATS"). The ATS grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS was enacted as part of the Judiciary Act of 1789 and has been on the books, in essentially its current form, ever since. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712-13 & n.10 (2004). Fundamentally, "the ATS is a jurisdictional statute [that] creat[ed] no new causes of action"; rather, it was "enacted on the understanding that the common law would provide a cause of action for the modest number of

international law violations with a potential for personal liability at the time." *Id.* at 724.[1]

Plaintiffs claim that the torture they suffered and the extrajudicial killings of their family members constituted violations of international law. Plaintiffs contend that Samantar is liable for these acts, both in his capacity as Minister of Defense and as Prime Minister of Somalia, because he "possessed and exercised command and effective control over the Armed Forces of Somalia" and that he "knew or should have known that his subordinates had committed, were committing, or were about to commit extrajudicial killings, . . . torture, crimes against humanity, war crimes, cruel, inhuman, or degrading treatment." J.A. 45.

Plaintiffs also contend that Samantar is liable under the Torture Victim Protection Act of 1991 ("TVPA"). The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture" or "subjects an individual to extrajudicial killing," is liable in a civil action for damages to the victim or the victim's legal representative. § 2(a), 106 Stat. 73. "Though the Torture Victim Act creates a cause of action for official torture, this statute, unlike the Alien Tort Act, is not itself a jurisdictional statute." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (concluding that the TVPA "permits the appellants to pursue their claims of official torture under the jurisdiction conferred by the Alien Tort Act and also under the general federal question jurisdiction of section

---

[1]According to the plain statutory language, one precondition for subject-matter jurisdiction to be conferred under the ATS is that suit be filed by an *alien*, not a citizen. *See Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) ("[The ATS] confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (*i.e.*, international law).") To the extent that any of the claims under the ATS are being asserted by plaintiffs who are American citizens, federal subject-matter jurisdiction may be lacking. This issue should be explored upon remand.

1331"); *see Arce v. Garcia*, 434 F.3d 1254, 1257 n.8 (11th Cir. 2006) (assuming that § 1331, not the ATS, provides the jurisdictional basis for the TVPA).

### C.

Samantar moved to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that he is entitled to immunity under the FSIA. The FSIA provides that, subject to certain exceptions not relevant here, "a *foreign state* shall be immune from the jurisdiction of the courts of the United States." 28 U.S.C. § 1604 (emphasis added).

Plaintiffs, of course, did not bring this action against Somalia or any other foreign state — they brought it against Samantar individually. Under the FSIA, however, the term "foreign state" encompasses more than merely the foreign sovereign itself; "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in [§ 1603(b)]." 28 U.S.C. § 1603(a).[2] A majority of the courts considering the scope of "agency or instrumentality" have concluded that an individual foreign official acting within the scope of his official duties qualifies as an "agency or instrumentality of a foreign state." *See, e.g.*, *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990).

The district court followed the majority view that individuals are covered under the FSIA and granted Samantar's motion to dismiss because "[t]he allegations in the complaint

---

[2]The FSIA distinguishes between "foreign state" and "agency or instrumentality of a foreign state" in only one instance – service of process under section 1608, which prescribes different methods for serving a foreign state and an instrumentality of that state. *See* 28 U.S.C. § 1608(a), (b). Otherwise, the phrase "agency or instrumentality of a foreign state" is essentially interchangeable with "foreign state" as those terms appear in the FSIA.

clearly describe Samantar, at all relevant times, as acting upon the directives of the then-Somali government in an official capacity, and not for personal reasons or motivation." J.A. 223. Additionally, the district court found it important that the current government in Somalia has expressly adopted the position that Samantar's alleged actions were taken in his official capacity.

The district court relied heavily upon two district court decisions. In *Belhas v. Ya'Alon*, 466 F. Supp. 2d 127 (D.D.C. 2006), a decision later affirmed by the District of Columbia Circuit Court of Appeals, *see* 515 F.3d 1279 (D.C. Cir. 2008), the court held that former Israeli general Moshe Ya'Alon was entitled to sovereign immunity under the FSIA against claims by civilian bombing victims pursuant to the ATS and the TVPA based on attacks conducted by the Israeli military in a 1996 skirmish with Hezbollah. Ya'Alon submitted a letter from the State of Israel officially affirming that his alleged acts were within the scope and course of his official duties and were "approved by the government of Israel in defense of its citizens against terrorist attacks." 466 F. Supp. 2d at 129 (internal quotation marks omitted). The court concluded that because plaintiffs attempted to impose liability based on Ya'Alon's command responsibility for state-approved attacks rather than acts of a personal or private nature, Ya'Alon "was acting as an agency or instrumentality of the foreign state [and was therefore] immune from suit under the FSIA." *Id.* at 130. Similarly, in *Matar v. Dichter*, 500 F.Supp.2d 284 (S.D.N.Y. 2007), the district court concluded that the FSIA immunized a former director of an Israeli intelligence agency from claims asserted under the ATS and the TVPA based on the director's involvement in the planning and execution of the bombing of a residential neighborhood in Gaza City. The district court in *Matar* based its conclusion on the absence of allegations suggesting that the director's conduct was of a personal nature and on a letter from the Israeli state department asserting that anything the director did in connection to the bombing incident was done in furtherance of his official duties.

In light of these decisions, the district court below reasoned that, "[a]s in the *Belhas* and *Matar* complaints, the complaint at issue does not allege that Samantar was acting on behalf of a personal motive or for private reasons." J.A. 218. The court further accorded "great weight" to the letters submitted by the current Somali government, concluding that the government's opinion reaffirmed that Samantar's involvement in the alleged atrocities was "in his official capacit[y]" and in furtherance of government efforts to "quell[ ] . . . the insurgencies from 1981 to 1989." J.A. 219. Accordingly, the district court concluded that Samantar was entitled to sovereign immunity under the FSIA and dismissed the plaintiffs' claims for lack of subject-matter jurisdiction. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("[T]he text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts.")

Plaintiffs challenge the district court's application of the FSIA on numerous grounds. Plaintiffs' most fundamental assertion is that Congress did not intend for individual foreign officials to claim sovereign immunity under the FSIA, *i.e.*, that the FSIA applies only to foreign states, not to individuals. Alternatively, plaintiffs contend that, even if the FSIA does apply to individual foreign officials, such persons are immune only if they are agents or officials of a foreign state at the time of suit. The FSIA, plaintiffs argue, does not shield *former* officials like Samantar from suit. We address each of these issues below.[3]

---

[3]Plaintiffs also contend that, even if the FSIA extends sovereign immunity to former foreign officials, the alleged acts attributed to Samantar, such as the torture and killing of civilians, are *per se* violations of "universally accepted norms of international law," *Kadic*, 70 F.3d at 243, which can never be within the scope of a foreign official's duties. Plaintiffs also claim that the FSIA is inapplicable because Somalia currently does not even exist in a form that would qualify it as a "foreign state" under the FSIA. *See* 28 U.S.C. § 1603(a). If there is no "foreign state," then *a fortiori* there is no "agency or instrumentality of a foreign state," 28 U.S.C. § 1603(b), as there would be no source from which an individual could derive sovereign immunity. In light of our disposition of this appeal, we need not address these arguments.

## II.

When Congress enacted the FSIA in 1976, it did so against a backdrop of foreign sovereign immunity jurisprudence spanning more than 150 years. *See Amerada Hess*, 488 U.S. at 434 n.1. Beginning with *The Schooner Exchange*, 11 U.S. (7 Cranch) 116 (1812), the Supreme Court essentially granted absolute immunity from suit to all foreign states. Since foreign sovereign immunity is a matter of comity rather than constitutional law, the Court routinely "deferred to the decisions of the political branches . . . on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). And, "[u]ntil 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.* In 1952, however, the State Department changed its policy of suggesting immunity in every case involving a foreign sovereign and instead adopted a restrictive theory of sovereign immunity which permitted "foreign states [to] be sued in United States courts for their commercial acts, but not for their public acts." *Amerada Hess*, 488 U.S. at 431 n.1. One consequence of the restrictive theory, however, was that "foreign nations often placed diplomatic pressure on the State Department," which still bore the primary "responsibility for deciding questions of sovereign immunity." *Verlinden*, 461 U.S. at 487.

In 1976, Congress enacted the FSIA, shifting responsibility for deciding questions of foreign sovereign immunity from the Executive Branch to the Judicial Branch "in order to free the Government from the case-by-case diplomatic pressures, [and] to clarify the governing standards." *Id.* at 488; *see* 28 U.S.C. § 1602. The FSIA essentially codifies the restrictive theory of foreign sovereign immunity under which a "foreign state" is "immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607."[4]

---

[4]None of these sections contains an applicable exception in this case. *See* 28 U.S.C. § 1605 (exceptions to foreign state's presumptive immunity

28 U.S.C. § 1604. Congress did not define the term "foreign state" except to say that it "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). In turn, subsection (b) defines "agency or instrumentality of a foreign state" as

> any entity—
>
> (1) which is a separate legal person, corporate or oth-erwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Because there is no explicit mention of individuals or natural persons, it is not readily apparent that Congress intended the FSIA to apply to individuals. Before we address the merits of this issue, however, we must make sure that we are not foreclosed from doing so by circuit precedent.

---

include waiver of immunity; commercial activity within or directly affecting the United States; various claims involving property; noncommercial torts committed in the United States; and maritime liens); § 1606 (prescribing the extent of a foreign state's liability on claims "with respect to which [it] is not entitled to immunity"; § 1607 (involving counterclaims in lawsuits brought in federal courts by a foreign state); *see generally Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-40 (1989) (listing and discussing exceptions set forth in § 1605).

## A.

Samantar takes the position that we settled the question of whether the FSIA applies to individual foreign government officials in *Velasco v. The Government of Indonesia*, 370 F.3d 392 (4th Cir. 2004), siding with the majority of the federal appellate courts that have directly addressed the issue.

As noted previously, the majority view clearly is that the FSIA applies to individual officials of a foreign state, as explained in the Ninth Circuit's seminal *Chuidian* decision. *See* 912 F.2d at 1099-1103. Most of the decisions embracing the view that individuals are covered by the FSIA either expressly adopt *Chuidian*'s reasoning or incorporate substantially similar reasoning. *See, e.g.*, *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 83 (2d Cir. 2008) (explaining that "agency or instrumentality" is broad enough to encompass "senior members of a foreign state's government"); *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815-16 (6th Cir. 2002) (concluding individual defendants were within "agency or instrumentality" provision); *Byrd v. Corporacion Forestal y Industrial de Olancho*, 182 F.3d 380, 388-89 (5th Cir. 1999) (adopting majority position as articulated in *Chuidian*); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) (same). *Chuidian* holds the definition of an "agency or instrumentality of a foreign state" under § 1603(b) encompasses "individual officials acting in their official capacity." 912 F.2d at 1101. By contrast, the Seventh Circuit stands alone in concluding that the FSIA does not apply to individuals. *See Enahoro v. Abubakar*, 408 F.3d 877, 881-82 (7th Cir. 2005) (rejecting the *Chuidian* approach as inconsistent with the statutory text).

For the reasons that follow, we believe this is still an open question in the Fourth Circuit. In fairness to Samantar, however, he is not alone in his reading of *Velasco*, as a number of courts and commentators believe *Velasco* adopted the majority position. *See, e.g.*, *Kensington Int'l Ltd. v. Itoua*, 505

F.3d 147, 160 (2d Cir. 2007) (reading *Velasco* as "conclud[-ing] that the FSIA applies to individuals acting in their official capacity" in reliance on *Chuidian*); Stewart, David P., *The UN Convention on Jurisdictional Immunities of States and Their Property*, 99 Am. J. Int'l L. 194, 196 n.13 (2005) (including *Velasco* in a list of decisions by "[a] growing number of U.S. courts [that] have held that the FSIA applies to individual officials of foreign governments to the extent their actions were performed in their official capacities"). We do not read our decision in *Velasco* in this manner.

It is true that *Velasco* cited *Chuidian* and noted that numerous courts have construed the FSIA to cover individual foreign officials acting within the scope of their authority. *Velasco*, however, was ultimately focused on the wholly separate question of whether, and under what circumstances, the acts of an individual operate to *bind* a foreign sovereign claiming immunity under the FSIA. *See Velasco*, 370 F.3d at 399-400.

The plaintiff in *Velasco* brought an action to collect on an Indonesian promissory note issued by staff members of Indonesia's National Defense Security Council ("NDSC"). Indonesia claimed sovereign immunity under the FSIA, and the parties agreed the only possible basis for jurisdiction was the FSIA's "commercial activity" exception under which there is no immunity against claims "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). As it turned out, the promissory notes were fraudulent instruments that the NDSC staff members had no authority to issue. Indonesia argued that the lawsuit was not based on commercial activity "by [a] foreign state," *i.e.*, that the unauthorized conduct of the NDSC staffers could not be attributed to Indonesia. *See Velasco*, 370 F.3d at 398. Applying the well-established tenet that an "act of an agent beyond what he is legally empowered to do is not binding on the government," *id.* at 399, we concluded that

> [b]y issuing the notes, the individual Defendants
> acted ultra vires and in violation of Indonesian law.
> As a consequence, the issuance of the notes cannot
> be characterized as the commercial activity of a for-
> eign state which divests the NDSC or the Govern-
> ment of Indonesia of their sovereign immunity.

*Id.* at 402. Thus, despite the reference to *Chuidian* and other decisions addressing the scope of § 1603(b), *Velasco* was not about whether an individual government official was entitled to sovereign immunity as an "agency or instrumentality of a foreign state." Rather, it was about whether the Indonesian government was bound, through *agency principles*, by the unauthorized acts of individual government officials.[5]

Accordingly, *Velasco* did not settle the question of whether Congress intended to confer sovereign immunity under the FSIA on an individual acting within the scope of his authority.

### B.

In determining congressional intent, we focus of course on the language of the provision at issue, but we also consider the overall structure and purpose of the statute. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Under the FSIA, an "agency or instrumentality of a foreign state" is defined as an "entity" that "is a separate legal person, corporate or otherwise." 28 U.S.C. § 1603(b)(1). The phrase

---

[5]*Velasco* also examined and rejected the question of whether a foreign state can be bound under the FSIA by an individual agent who has apparent but not actual authority. *See Velasco v. The Government of Indonesia*, 370 F.3d 392, 400 (4th Cir. 2004) ("Whether a third party reasonably perceives that the sovereign has empowered its agent to engage in a transaction . . . is irrelevant if the sovereign's constitution or laws . . . do not authorize the agent's conduct and the third party fails to make a proper inquiry. We conclude that a foreign official's manifestation of authority to bind the sovereign is insufficient to bind the sovereign.").

"separate legal person" is laden with corporate connotations. Generally, courts use this phrase as "a convenient way to capture the essence of the principal of limited liability" that flows from "[t]he fiction of corporate personhood." *Beiser v. Weyler*, 284 F.3d 665, 670 (5th Cir. 2002). "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). The idea of a "[s]eparate legal personality has been described as an almost indispensible aspect of the public corporation." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) (internal quotation marks omitted). We find the Seventh Circuit's view of this passage especially persuasive:

> [I]f it was a natural person Congress intended to refer to, it is hard to see why the phrase "separate legal person" would be used, having as it does the ring of the familiar legal concept that corporations are persons, which are subject to suit. Given that the phrase "corporate or otherwise" follows on the heels of "separate legal person," we are convinced that the latter phrase refers to a legal fiction—a business entity which is a legal person. If Congress meant to include individuals acting in the official capacity in the scope of the FSIA, it would have done so in clear and unmistakable terms.

*Enahoro*, 408 F.3d at 881-82. Thus, the FSIA's use of the phrase "separate legal person" suggests that corporations or other business entities, but not natural persons, may qualify as agencies or instrumentalities.

Moreover, in order to ensure that an "agency or instrumentality" seeking the benefits of sovereign immunity is actually connected to a "foreign state," the FSIA requires that the "entity" be "neither a citizen of a State of the United States *as defined in section 1332(c) and (e)* of [Title 28], nor *created* under the laws of any third country." 28 U.S.C. § 1603(b)(3)

(emphasis added). Sections 1332(c) and (e), which govern the citizenship of corporations and legal representatives of estates, are inapplicable to individuals, and it is nonsensical to speak of an individual, rather than a corporate entity, being "created" under the laws of a country.

Construing "agency or instrumentality" to refer to a political body or corporate entity, but not an individual, is also consistent with the overall statutory scheme of the FSIA. Section 1608, for example, establishes the exclusive means for service of process on a foreign state or its agencies or instrumentalities. *See* 28 U.S.C. § 1608(a), (b); Fed. R. Civ. P. 4(j)(1). Section 1608(b), which addresses service upon an agency or instrumentality, does not contemplate service on an individual, but instead provides that absent a "special arrangement for service between the plaintiff and the agency or instrumentality," service must be perfected "by delivery of a copy of the summons and complaint either to an *officer*, a *managing or general agent*, or to any other agent *authorized by appointment or by law* to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(b) (emphasis added). This language is strikingly similar to the general procedural rule for service on a corporation or other business entity. *See* Fed. R. Civ. P. 4(h)(1)(B). The requirements for serving an individual, by contrast, can be found back in Rule 4(e) ("Serving an Individual Within a Judicial District of the United States"), or even Rule 4(f) ("Serving an Individual in a Foreign Country"). The fact that section 1608 uses language virtually identical to that found in Rule 4(h) for service upon corporate entities and fails to prescribe or refer to service provisions for individual defendants strongly supports our interpretation that "an agency or instrumentality of a foreign state" cannot be an individual.

We also find confirmation for our understanding of the FSIA in the House Committee Report on the FSIA. The House Report explained that "separate legal person" was "in-

tended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." H.R. Rep. No. 94-1487, at 15 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6614. The House Committee Report provided some examples of entities that would satisfy the prerequisites for an agency or instrumentality under section 1603(b), "including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name." H.R. Rep. No. 94-1487, at 16, *as reprinted in* 1976 U.S.C.C.A.N. at 6614.

Accordingly, we conclude, based on the language and structure of the statute, that the FSIA does not apply to individual foreign government agents like Samantar. Accordingly, the district court erred by concluding that Samantar is shielded from suit by the FSIA.

### III.

Plaintiffs also present the closely related argument that the FSIA requires the court to assess whether an entity qualifies as an "agency or instrumentality of a foreign state" under section 1603(b) based on that entity's status at the time that the action is filed rather than the time of the underlying conduct. More simply, plaintiffs believe that even if the FSIA applies to individual defendants, Congress did not intend to shield *former government agents* from suit under the FSIA. We agree.

The Supreme Court addressed the temporal implications of section 1603(b) in *Dole Food Co. v. Patrickson*, 538 U.S. 480 (2003). In *Dole Food*, the Dead Sea Companies corporation claimed immunity under the FSIA as an instrumentality of the State of Israel, which owned a majority share in parent com-

panies of the Dead Sea Companies at the time of the events being litigated but not at the time of suit. *See* 28 U.S.C. § 1603(b)(2) ("An 'agency or instrumentality of a foreign state'" includes an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."). The Court held that "the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed." *Id.* at 478. The Court explained that its focus on the significance of the present tense was faithful to the general rule "that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Id.* (quoting *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)).

Samantar argues that *Dole Food* does not apply here because the Court was construing language that applied exclusively to corporations. Unfortunately for Samantar, this argument knocks the legs out from under his own contention that the FSIA applies to individuals. If, as Samantar suggests, an individual can be an "agency or instrumentality of a foreign state," then the language of section 1603(b)(2) — the very section considered in *Dole Food—must* apply to both corporations *and* individuals. An entity, regardless of its form, can be an "agency or instrumentality of a foreign state" only if that entity satisfies all three provisions of subsection (b). *See* 28 U.S.C. § 1603(b). Therefore, we cannot dismiss the Supreme Court's construction merely because the defendant in *Dole Food* was a corporate entity. And, like the "ownership interest" clause at issue in *Dole Food*, the clause immediately preceding it is also expressed in the present tense. Under section 1603(b)(2), an entity can be an "agency or instrumentality of a foreign state" only if that entity "*is* an organ of a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2) (emphasis added); *cf. Yi v. Federal Bureau of Prisons*, 412 F.3d 526, 533 (4th Cir. 2005) (noting "the strong presumption that identical terms used in the same sentence of a statute carry the same meaning"). Samantar's interpretation would require us to bypass the plain text of the statute in favor

of a reading at odds with *Dole Food*. We see nothing in the statute suggesting that, if Congress intended individual foreign officials to be covered by the FSIA in the first place, it likewise intended to treat individuals differently than any other entity qualifying as an "agency or instrumentality" or depart from the principle that jurisdiction hinges on "the state of things at the time of the action" only in the case of individuals. *Dole Food*, 538 U.S. at 478 (internal quotation marks omitted).

Finding the plain text unavailing, Samantar offers a policy basis for distinguishing between former individual government officials and corporations formerly owned by a foreign state. He suggests that when a government sells or transfers its majority interest in a corporation, the new purchasers have an opportunity to bargain for indemnification for any liabilities arising before the transfer of ownership, making immunity from suit less critical than it is for former individual government agents, who have no such opportunity. Beyond requiring us to ignore unambiguous language in a statute, which we cannot do, *see Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002), Samantar's reasoning is inconsistent with the purpose of foreign sovereign immunity, which is to protect international relations between the United States and foreign sovereigns as a matter of comity. *See Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). Samantar's hypothesis, by contrast, focuses on the protection of individual foreign officials in a way that is reminiscent of qualified immunity or other status-based immunities that are concerned with matters as they exist at the time of the offending conduct.

*Dole Food* is instructive on this point, explaining that qualified immunity, for example, "prevent[s] the threat of suit from crippling the proper and effective administration of public affairs," *id.* at 479 (alteration and internal quotation marks omitted), while "[f]oreign sovereign immunity, by contrast, is *not meant to avoid chilling* foreign states or their instrumentalities *in the conduct of their business* but to give foreign

states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." *Id.* (emphasis added); *see Verlinden*, 461 U.S. at 486 (explaining that the underpinnings of "foreign sovereign immunity" are "a matter of grace and comity on the part of the United States"). The doctrine of foreign sovereign immunity developed in the pre-FSIA common law out of a concern for "our national interest" and the preservation of amicable international relations. *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945) (observing that the assertion of judicial power over the property of a foreign state may be viewed as "an affront to its dignity and may . . . affect our relations with it"). The FSIA preserves this basic purpose of sovereign immunity, which "has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit," but instead "aims to give foreign states . . . some *present* protection from the inconvenience of suit as a gesture of comity." *Altmann*, 541 U.S. at 696 (internal quotation marks omitted) (emphasis in original).

In sum, we conclude that even if an individual foreign official could be an "agency or instrumentality under the FSIA," sovereign immunity would be available only if the individual were still an "agency or instrumentality" at the time of suit. *Dole Food* guides our resolution of this issue, regardless of whether the purported agency or instrumentality is a corporation owned by a foreign government or an individual foreign official; we see nothing in the statute or its underlying purpose to suggest otherwise. Samantar was certainly no longer a Somali government official at the time the plaintiffs brought this action and is therefore not entitled to immunity under the FSIA.

## IV.

For these reasons, we reverse the decision of the district court that it lacks subject matter jurisdiction under the FSIA,

and we remand for further proceedings. Samantar suggests, despite the adverse ruling on the question of sovereign immunity, that we ought to affirm the result on alternative grounds. Samantar contends that, even if he is not covered under the FSIA, he is shielded from suit by a common law immunity doctrine such as head-of-state immunity. *See In re Grand Jury Proceedings*, 817 F.2d 1108, 1110 ("Head-of-state immunity is a doctrine of customary international law . . . maintain[ing] that a head of state is immune from the jurisdiction of a foreign state's courts, at least as to authorized official acts taken while the ruler is in power.") (4th Cir. 1987); *see also Ye v. Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) ("Because the FSIA does not apply to heads of states, the decision concerning the immunity of foreign heads of states remains vested where it was prior to 1976 — with the Executive Branch."). He also contends that plaintiffs' claims under the ATS and the TVPA are time-barred, and that plaintiffs' claims are also barred because they failed to exhaust their legal remedies in Somalia. In view of its conclusion that it lacked jurisdiction, the district court did not address these issues below. We conclude that these questions are better addressed in the first instance by the district court and therefore decline to address them now. We conclude only that Samantar is not entitled to sovereign immunity under the FSIA; whether he can successfully invoke an immunity doctrine arising under pre-FSIA common law is an open question which Samantar is free to pursue on remand, along with the aforementioned procedural questions. Finally, our decision should not be read to intimate that plaintiffs have necessarily stated viable claims against Samantar under the ATS or TVPA; those are also open questions for remand.

*REVERSED AND REMANDED*

DUNCAN, Circuit Judge, concurring in Parts I and II and concurring in the judgment:

With respect, I join in all but Part III of Judge Traxler's incisive opinion. I agree with the majority that the Foreign

Sovereign Immunities Act ("FSIA") does not, upon examination of its plain language and the context of its drafting, apply to individual officers of foreign states. I note as well that our decision on this issue is not the radical departure from the course of current authority that it might seem. While few of our sister circuits have reached the same conclusion, the United States Department of State has argued in analogous cases that the common law immunities that predate the FSIA remain the appropriate body of law under which courts should consider the sovereign immunity of individuals. Our decision in this case is in keeping with this position and with the statutory text of the FSIA itself. I therefore concur in Parts I and II of the opinion and in the judgment reversing the district court and remanding this case for further proceedings.

Our conclusion that the FSIA does not apply to individuals is sufficient to resolve the case before us. Therefore, I do not join my colleagues in reaching the question of whether and how *Dole Food Co. v. Patrickson*, 538 U.S. 480 (2003), would apply to individual foreign officers. Prudential considerations also militate against an expansive holding. Sovereign immunity, while a judicial question, is inextricably bound up with the executive branch's conduct of foreign affairs, and I would prefer to err on the side of caution in the extension of our jurisprudence.